UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 06-60237-CIV-SEITZ/MCALILEY

STUART WEITZMAN, LLC,

        Plaintiff,

v.

MICROCOMPUTER RESOURCES, INC,

        Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment [DE 23]. Plaintiff Stuart Weitzman, LLC ("Weitzman") seeks a declaratory judgment (1) that it owns a copy of the software that it allegedly purchased from Defendant MicroComputer Resources, Inc. ("MCR") and (2) that it has the right to modify and/or add features to the software copy for its own internal business. MCR, however, maintains that it owns all copies of the disputed software, and that Weitzman was merely a licensee and therefore not entitled to summary judgment. Having reviewed the motion,[1] the response and the reply thereto, the parties' supplemental filings, the entire record and the parties' oral argument, Weitzman's summary judgment motion is granted because there are no genuine issues of fact as to the ownership of its copy of the disputed software and as a matter of law it is entitled to modify its copy for its internal business use.

---

[1] Weitzman filed its Complaint on February 24, 2006. Five months later, Weitzman moved for summary judgment arguing that it owned its copy of the Custom Software and can modify it. The Court stayed consideration of the summary judgment motion to allow MCR to conduct discovery relevant to the ownership issue. (*See* DE 98.) After conducting such discovery, MCR responded to the summary judgment motion and Weitzman replied. (*See* DE 105.)

1

**I.   Issue Presented**

Weitzman's declaratory judgment action rests on 17 U.S.C. § 117 of the Copyright Act which limits the exclusive rights of the owners of a copyright in a computer program. Section 117(a) provides in pertinent part that "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided . . . that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." The threshold issue before the Court is whether Weitzman owned its copy of the disputed computer program. Because the parties never executed a written agreement setting out their respective rights, it is necessary to discuss the parties' 13-year relationship.

**II.   Factual Background**

Weitzman and MCR began their business relationship in 1993. (Kodroff Decl., July 27, 2006 ("Kodroff Decl.") ¶ 5.) Weitzman is a designer, manufacturer and seller of women's high-end shoes and related fashion items. (*Id.* ¶ 4.) MCR is engaged in the business of providing computer software, software programming, and other services to its clients. (Paul Fountas Decl., March 9, 2007 ("P. Fountas Decl.") ¶ 3.) MCR's owners are Paul and John Fountas who each own 50% of the outstanding shares and are each directors of the company.[2] (*Id.* ¶ 4.) In 1993, Weitzman hired John Fountas and MCR as computer consultants providing among other things, computer support and computer software design and creation services. (*Id.* ¶ 5.)

Initially, MCR performed services on Weitzman's existing order management computer software. (*Id.* ¶ 6.) Beginning in 1998, however, Weitzman hired MCR to replace the existing

---

[2] John and Paul Fountas are currently adverse parties in a state-court proceeding regarding the dissolution of MCR as well as John Fountas' alleged breach of fiduciary duties. (P. Fountas Decl. ¶ 14.)

software ("Order Management System Software" or "OMS Software") which handled worldwide client orders. (*Id.* ¶ 6.) The information the OMS Software organized was then delivered to Weitzman's offices in Spain for inclusion into "Expose," Weitzman's already existing order fulfillment software. (Kodroff Decl. ¶ 6.) However, the Expose software could not read the OMS Software's information. (*Id.* ¶ 8.) Initially, Weitzman engaged a computer programmer in Spain to update the Expose software to make it function with the OMS. (*Id.* ¶ 9.) But, in 2003, Weitzman increased MCR's tasks and engaged it to rewrite Expose and integrate it with the new OMS Software. (*Id.* ¶ 8-9.) The combination of the new OMS Software and the new Expose software is the "Custom Software."[3] (*Id.* ¶ 9.)

From time to time, MCR billed Weitzman for the hourly services and Weitzman would pay the invoices. (P. Fountas Decl. ¶ 7.) The exact amount that Weitzman paid to MCR in connection with the building of the Custom Software is in dispute, however, there is agreement that the amount is in excess of one million dollars ($1,000,000.00). (April 13, 2007 Hearing Tr. At 11; Kodroff Decl. ¶ 15.)[4]

The parties understood that the Custom Software would take many years to build and require constant maintenance, updates and modifications to continue operating properly. (*Id.* ¶

---

[3] The source code in the Custom Software, which is the human readable computer code for the new OMS Software, was written and modified by MCR but stored on Weitzman's servers in Weitzman's offices. (P. Fountas Decl. ¶ 8; Kodroff Decl. ¶ 13.) John Fountas explained that he stored a portion of the software on the servers for practical purposes and the other portions were stored on such servers by choice. (John Fountas Depo., Feb. 27, 2007 ("J. Fountas Feb. 27 Depo."), at 60-61.) John Fountas also stated in his state court deposition that the parties stored the software on Weitzman's servers by agreement. (John Fountas State Court Depo., January 4, 2007 ("J. Fountas State Court Depo."), at 92.)

[4] Weitzman alleges that it paid a premium because the Custom Software was custom-built and tailored to Weitzman's business and required constant maintenance, modifications and updates. (Kodroff Decl. ¶ *15.*) MCR, on the other hand, claims that it gave Weitzman reduced pricing and committed the majority of its time to Weitzman's work. (P. Fountas Decl. ¶ 10.) MCR further maintains it only made fiscal sense to do this if MCR had all the rights to all copies of the Custom Software. (*Id.*)

3

10.)  The parties also understood the Custom Software would be expandable to be capable of adding functionalities, such as credit analysis of customers, mail merge, and others in order to grow with Weitzman's specific business needs.  (*Id.*)  Weitzman maintains that its agreement with John Fountas and MCR was that it could hire programmers in addition to MCR to update, fix, modify or expand all portions of the Custom Software, that Weitzman could replace MCR at its sole discretion and there were no agreements to limit Weitzman's right to use or modify the Custom Software.  (*Id.* ¶ 11.)  Weitzman also asserts that its CFO, Phil Kodroff, worked closely with John Fountas to build, install and modify the Custom Software including, fixing "bugs," adding features, and ensuring that it was working properly.  (Kodroff Decl. ¶ 12.)  On the other hand, MCR alleges that it retained ownership of all copies of the software and that Weitzman's use of the Custom Software was only as a licensee (P. Fountas Decl. ¶ 5).  MCR also contends that the parties had an oral agreement to this effect, and that the parties began in early 2005 to put this agreement into writing.[5]  (P. Fountas Decl. ¶ 9.)

For twelve years, the parties' relationship had functioned without a written agreement. (P. Fountas Decl. ¶ 6.)  In approximately February of 2005, the parties began drafting an "Engagement Agreement" (hereinafter, "EA") to reduce to writing the parties' rights in the Custom Software.[6]  MCR argues that the final version of the EA (exchanged on May 16, 2005) documented the parties' existing understanding as to the intellectual property rights in the Custom Software.  Weitzman, on the other hand, contends that the language of the EA is prospective in nature.

---

[5]  Paul Fountas stated that MCR planned to market the OMS Software to other parties and had a conversation with Kodroff about these plans.  (Paul Fountas Decl. ¶ 11.)

[6]  In the EA, the Custom Software is termed "MCR Software."

The "Recitals and Definitions" section of the EA states that Weitzman "desires to engage MCR and seeks, from MCR, service, advice and assistance in accomplishing certain computer related objectives." The "Engagement and Billing" section states that "MCR will be engaged upon execution of this agreement and receipt of a retainer of $0 U.S. dollars." Furthermore, the EA expressly states that the term of the agreement "shall begin on the Effective date" which is described as the date that the EA is executed.

This version of the EA also contained provisions which address ownership of the Custom Software. It provided (1) that MCR is the owner of the Custom Software and that MCR has the right to modify and grant Weitzman a license for its use; (2) that the Custom Software and all copies thereof are proprietary to MCR and title remains in MCR; (3) that MCR retains all patent, copyright, trademark and trade secret rights; and (4) that all copies of the Custom Software made by Weitzman are the property of MCR.[7]  (*Id.*)

MCR alleges that Weitzman failed to sign the agreement because it was directly speaking with John Fountas to arrange an agreement wherein John Fountas would leave MCR, start a competing company and begin working for Weitzman, along with MCR programmers, Jose and Francisco Araujo (the "Araujos").[8] (P. Fountas Decl. ¶ 13.) On December 5, 2005, John Fountas

---

[7] This provision states in relevant part:

<u>Ownership:</u> MCR represents that it is the owner of the MCR Software and all portions thereof and that MCR has the right to modify same and grant [Weitzman] a license for its use. MCR Software and all programs developed hereunder and all copies thereof are proprietary to MCR and title thereto remains in MCR. All applicable rights to patents, copyrights, trademarks and trade secrets in MCR Software or any modifications made at [Weitzman's] request shall remain in MCR. [] All copies made by [Weitzman] of MCR Software and other programs developed hereunder, including translations, compilations, partial copies with modification and updated works, are the property of MCR.

[8] MCR has expended much effort to detail the improprieties John Fountas allegedly committed. However, any legal conclusions about such actions are more appropriately addressed in the state-court action.

instituted a corporate dissolution suit against MCR in the Seventeenth Judicial District in Broward County, case number 05-17543(12). (*Id.* ¶ 14.) Fifteen days later, Paul Fountas sent Kodroff a letter stating in relevant part that:

> Stuart Weitzman is not entitled to the use or possession of MCR's source code, explicitly or impliedly. Stuart Weitzman has the right to use the software but it cannot be modified, changed, or reverse engineered by anyone. MCR must agree and consent, in writing, to any changes in this regard.

(Kodroff Decl. ¶ 16; Kodroff Decl. Exh. B.)

On February 10, 2006, John Fountas resigned his status as an employee of MCR, though he remains an MCR director. (P. Fountas Decl. ¶ 14.) One day later, the Araujos terminated their independent contractor relationship with MCR. (*Id.*) Weitzman filed this lawsuit shortly thereafter.

**III.    Standard of Review**

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Maniccia v. Brown*, 171 F.3d 1364, 1367 (11th Cir. 1999). The movant bears the initial responsibility of informing the court of the basis for its motion and of identifying those materials which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In response to a properly supported motion for summary judgment, "the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts which show a genuine issue for trial." Fed. R. Civ. P. 56(e). Unless there is evidence in the record on which a jury could return a verdict for the nonmoving party, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct.

2505, 2512, 91 L. Ed. 2d 202 (1986); *Doll v. Grand Union Co.*, 925 F.2d 1363, 1365 (11th Cir. 1991). The court, however, must view the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Maniccia*, 171 F.3d at 1367.

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A court is not to resolve factual issues, but may only determine whether factual issues exist. A material fact is one which "might affect the outcome of the suit under the governing law. . . ." *Id.* at 248. Therefore, the appropriate inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

**IV.  Analysis**

Weitzman seeks a declaratory judgment on two separate issues related to the Custom Software. First, Weitzman argues that it owns its copy of the Custom Software. Second, Weitzman asserts that it has the right to modify the Custom Software for its internal business needs.

    **a.  Weitzman Owns Its Copy of the Custom Software**

The parties cite to two separate cases to support their competing positions that under Section 117(a) of the Copyright Act they own the copy of the Custom Software that Weitzman

uses.[9] Weitzman relies heavily on the Second Circuit opinion in *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2nd Cir. 2005) in which the appellate court analyzed five factors to determine which party owned a copy of software. MCR counters that the dispositive case is *DSC Communications, Corp. v. Pulse Communications, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999) ("*DSC Communications*")[10] in which the Federal Circuit held that where a written agreement severely restricted the rights of the user of a copy of software, the user is not an owner for purposes of Section 117(a). A discussion of the facts and legal conclusions in these cases reveals that *Krause* is the controlling case, and therefore guides the Court's application of Section 117.

1.  ***Krause v. Titleserv***

Plaintiff Krause wrote over thirty-five computer programs (source code) for Titleserv between 1986 and 1996. The eight programs at issue in the litigation enabled Titleserv to track and report on the status of client requests and other aspects of its operations. The programs were installed on Titleserv's computer network and were accessible to Titleserv employees.

In 1996, the parties began negotiating Krause's assignment of the copyright in his programs to Titleserv in exchange for a five-year consulting agreement. However, before

---

[9] 17 U.S.C. §117 states as follows:

Limitations on exclusive rights: Computer programs

(a) Making of additional copy or adaptation by owner of copy.--Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

[10] The Federal Circuit in *DSC Communications* discussed in detail the Ninth Circuit's holding in *MAI Sys. Corp. V. Peak Computer, Inc.* 991 F.2d 511 (9th Cir. 1995). In doing so, the Federal Circuit rejected a portion of the Ninth Circuit's holding and found that a licensee of a computer program can also be an owner of copy of that software for purposes of Section 117(a).

8

agreement was reached, Krause terminated his relationship with Titleserv after learning that he would have to take directions from the Director of Information Technology. When Krause left, he took his notebook computer, which contained the only copies of the source code for two of the programs, but left copies of the source code for the other six programs on the Titleserv file servers. Krause also left executable versions of all eight programs on Titleserv's file servers, but locked them with a command, which prevented the conversion from the executable code back to the source code. Krause told Titleserv that it was free to continue using the executable code as it existed on the day he left, but asserted that Titleserv had no right to modify the source code. Inability to modify the source code would have severely limited the value of the programs to Titleserv.

Titleserv sued Krause alleging misappropriation of its property. While the suit was pending, Titleserv employees circumvented Krause's "lock" on the executable code and decompiled it back into source code. An employee then modified the code by fixing bugs, adding new customers and changing customer addresses to keep the programs functioning while Titleserv developed a new, Windows-based system. Titleserv phased out Krause's system in late 1997 or early 1998. Thereafter, Krause sued Titleserv for copyright infringement based on Titleserv's alleged copying of his programs and its production of derivative works. After discovery, Titleserv moved for summary judgment on the ground that 17 U.S.C. § 117(a)(1) protected its use and modification of its copy of Krause's programs. The district court granted summary judgment and Krause appealed.

Section 117 of the Copyright Act allows the owner of a copy of a computer program to copy or modify the program for limited purposes without incurring liability for infringement if the new adaptation of the program (A) was made by the "owner of a copy of [the] computer

program;" (B) was "created as an essential step in the utilization of the computer program in conjunction with a machine;" and (C) was "used in no other manner." *Krause*, 402 F.3d at 121-22. The Circuit Court began its analysis of whether Titleserv was an "owner" of its copy of the computer programs noting that Krause confused ownership of the copyright with ownership of a copy of the copyrighted material.[11] *Id.* The appellate court held that the determination of "ownership" of a copy of software does not depend on the presence or absence of formal title, but requires an analysis of whether the party seeking to be declared the owner "exercises sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a)" regardless of title. *Id.* at 124.

Those incidents of ownership included that (1) Titleserv paid Krause substantial consideration to develop the programs; (2) Krause customized the software to serve Titleserv's operations; (3) the copies of the software were stored on a server Titleserv owned; (4) Krause never reserved the right to repossess the copies Titleserv used and agreed that Titleserv had the right to continue to possess and use the programs forever regardless of whether its relationship with Krause terminated; and (5) Titleserv was similarly free to discard or destroy the copies any time it wished. *Id.* In making its legal determination, the Second Circuit considered Krause's evidence that Titleserv, acting through its CEO, orally agreed that it would possess the copies of the software as a mere licensee. However, the Court found that Krause's oral agreement evidence was conclusory and not sufficient to raise a material issue of fact. *Id.* at 124.

---

[11] The *Krause* court discussed the legislative history of § 117(a). *Krause*, 402 F.3d at 121-22. Section 117(a) was based on the recommendations of the National Commission on New Technological Uses of Copyrighted Works ("CONTU"). Congress enacted the language CONTU proposed with one notable exception, it used the word "owner" rather than the proposed phrase "rightful possessor." *Id.* The Second Circuit found, however, that use of the word "owner" did not indicate an intention on the part of Congress to limit the protection of the statute to those possessing formal title. *Id.* at 123.

10

2.     *DSC Communications, Corp.v. Pulse Communications, Inc.*

In *DSC Communications*, plaintiff DSC Communications Corp. ("DSC") sued Pulse Communications, Inc. ("Pulse") for contributory infringement in DSC's copyright of certain software used with one of DSC's products. DSC manufactured Digital Loop Carriers ("DLC's"). A DLC is an electronic device that allows telephone companies to serve large numbers of subscribers efficiently.[12] The devices at the heart of the dispute were the "Litespan 2000" DLC and the interface cards which both DSC and Pulse designed to work with the Litespan 2000.[13] The Litespans and the individual interface cards each require software to operate. The two pieces of software at issue were the Litespan System software and the software specifically used by the interface cards. When the interface cards were powered up, copies of the software were downloaded into the memory of the card. When the card was powered down, the copies of the software ceased to exist. This design allowed changes to be made to the software at a central location with no need to update the software in the individual cards.

DSC designed the Litespan to be used in the telephone networks of the Regional Bell Operating Companies ("RBOC's") and it transferred the Litespan technology to the RBOC's through a series of agreements. The agreements all contained provisions that licensed both types of software to the RBOC's. The dispute arose when Pulse developed a Litespan compatible card to compete with DSC's card. Pulse did not develop its own software, but rather designed its card so that it could download the DSC software from DSC's Litespan system.

---

[12] Before the invention of the DLC, telephone companies had to run copper wire from their central offices to the telephones of each of their subscribers. DLCs allow the individual copper lines to be run over much shorter distances, resulting in large savings for telephone companies. Typically, a DLC is placed in a location central to a number of subscribers and copper lines are run over relatively short distances from the DLC to subscribers. The signals between the DLC and the central telephone office travel over a high-bandwidth (e.g. fiber optic) digital channel.

[13] The cards allow different types of signals to be compatible with the way the Litespan 2000 functions.

To determine whether Pulse had contributed to the infringement of DSC's software, the Federal Circuit first had to determine whether DSC or the RBOC's owned the copies of the software. The district court had found that the RBOC's owned the software because they "obtained the software by making a single payment and obtaining a right to possession of the software for an unlimited period." The Federal Circuit, however, rejected this finding because the licensing agreements between DSC and the RBOCs "severly limit[ed] the rights of the RBOCs with respect to the [] software in ways that are inconsistent with the rights normally enjoyed by owners of copies of software."[14] *DSC Communications, Inc.*, 170 F.3d at 1361. The appeals court stated that each of the DSC-RBOC agreements characterized the RBOC's as "non-owners" of the copies of software. *Id.* Moreover, it found that the agreements limited the RBOC's right to transfer copies of the software or to disclose the details of the software to third parties and the agreements prohibited the RBOCs from using the software on hardware other than that provided by DSC. *Id.* Thus, based on the language of the agreements, the Federal Circuit found that DSC was the owner of the copies of software that the RBOCs used.

### 3. The EA Does Not Provide Evidence of the Parties' Existing Agreement

Both *Krause* and *DSC Communications* stand for the proposition that a court must look to the nature of a party's rights in a piece of software to ascertain whether it is an "owner" under Section 117(a). To support its position that Weitzman's use of the Custom Software was severely restricted, MCR argues that the EA documents the terms of the parties' existing oral

---

[14] In rejecting the district court's determination, the appellate court stated:

> The concept of ownership of a copy entails a variety of rights and interests. The fact that the right of possession is perpetual, or that the possessor's rights were obtained through a single payment, is certainly relevant to whether the possessor is an owner, but those factors are not necessarily dispositive if the possessor's right to use the software is heavily encumbered by other restrictions that are inconsistent with the status of owner.

*DSC Communications, Inc.*, 170 F.3d at 1362.

agreement. Weitzman, on the other hand, argues that the EA was prospective in nature, and because it was never executed, it does not establish the parties' rights in copies of the Custom Software.

The various versions of the EA support Weitzman's position because the language of the document is future oriented. For example, the "Recitals and Definitions" section of the draft EA states that Weitzman "*desires to engage* MCR and seeks, from MCR, service, advice and assistance in accomplishing certain computer related objectives." Further, in the "Engagement and Billing" section, it states, "MCR *will be engaged upon execution of this agreement* and receipt of a retainer of $0 U.S. dollars." Furthermore, the term of the EA expressly states that the agreement "shall begin on the Effective date" which is described as the date that the EA is executed. Thus, as a matter of law, the EA was a prospective agreement that cannot be relied upon as a document expressing the terms of the parties' existing agreement because it was never executed. *Doll*, 925 F.2d at 1370 (stating that a "court surely would not infer consent to an unsigned agreement when the parties clearly predicated a binding agreement only on the actual execution of the contract").

Consequently, MCR's references to evidence[15] that Weitzman may have agreed to the terms in the EA does not change the fact that the document cannot be relied upon because it was prospective in nature and would only be binding upon execution. Because neither party can claim formal title ownership of the copy of the Custom Software pursuant to a written agreement

---

[15] As evidence that Weitzman acquiesced to the terms of the draft EA, MCR states that (1) Weitzman's counsel was directed to put Weitzman's understanding of the oral agreement in the draft EA; (2) that each version of the draft EA stated that MCR owned all copies of the Custom Software; and (3) Kodroff approved the draft EA. (MCR's Response at 12-13.)

as in *DSC Communications*,[16] it is necessary to analyze the parties' rights in the copy of the Custom Software pursuant to the factors set forth in *Krause*.

### 4. Applying The Krause Factors

The *Krause* factors weigh in favor of Weitzman's ownership of its copy of the Custom Software.[17] Weitzman paid MCR a substantial sum to develop the programs for its benefit. The Custom Software was specifically designed to serve Weitzman and was stored on Weitzman's servers. MCR did not formally reserve a right to repossess the copy of the Custom Software Weitzman used or to limit Weitzman's freedom to discard or destroy its copies of the software anytime it wished.

### A. Weitzman Paid MCR a Substantial Sum to Possess and Use a Copy of the Custom Software for Weitzman's Sole Benefit and the Custom Software was Specifically Customized to Serve Weitzman

It is undisputed that Weitzman paid a substantial sum to obtain a copy of the Custom Software for its sole benefit which was tailored for its business. While the exact amount is not agreed upon, MCR specifically acknowledged that Weitzman paid MCR in excess of $1 million. MCR first argues, however, that Weitzman only paid for hourly services not for a copy of the Custom Software. This distinction misconceives the *Krause* test. The question is not whether Plaintiff was paid by the hour or in a lump sum, but whether Plaintiff was paid "substantial

---

[16] *DSC Communications* is also factually distinguishable from this case because Pulse's interface cards allowed the RBOC's to *continually* infringe on DSC's copyright in its software. Each time that the interface cards were powered up, the RBOCs received the benefit of DSC's updated software. In contrast, because Weitzman only claims to own its copy of the Custom Software, Weitzman does not receive the on-going benefit of MCR's updates and modifications to the Custom Software.

[17] The *Krause* court enumerated five factors to analyze ownership. However, under the facts of this case, it is more efficient to combine the first two factors and the last two factors because the groupings involve the same factual circumstances. Thus, whether Weitzman paid substantial consideration for the Custom Software for its sole benefit and whether MCR tailored the Custom Software to Weitzman's needs are discussed together. Additionally, whether MCR reserved the right to repossess the Custom Software versus Weitzman's right to perpetually use it and whether Weitzman had the right to discard or destroy it are addressed jointly.

consideration" to "develop" the software. *See Krause*, 402 F.3d at 124. Here, while Weitzman paid MCR for other activities such as consulting and other services, it undeniably paid MCR to "develop" the Custom Software in the same manner that Titleserv paid Krause. Thus, the fact that MCR claims that Weitzman paid it for hourly services to develop the Custom Software and not for an actual copy of it, is a distinction that does not make a difference.

Additionally, MCR claims that the Custom Software was not developed *solely* for Weitzman's use. In support of this assertion, MCR points to the fact that Kodroff testified that MCR had plans to market the Custom Software to other parties. However, while it is conceivable that the Custom Software or portions thereof could be sold to other parties, it is undisputed that the Custom Software was built specifically for Weitzman's business. MCR expressly stated in its response that "MCR worked for [Weitzman] as a designer and creator of software *for* [*Weitzman*]...." (MCR's Response at 2.) Moreover, the parties do not dispute that the Custom Software was a combination of the new OMS Software and Weitzman's updated Expose software. In fact, Weitzman initially engaged MCR to to rewrite Weitzman's Expose software such that it could be integrated with the new OMS Software. Thus, MCR's contention that it did not create the Custom Software solely for Weitzman's use is without merit.

Furthermore, the fact that Weitzman engaged MCR to customize the software weighs in favor of Weitzman's ownership of its copy of the Custom Software. MCR specifically designed the Custom Software such that it could handle Weitzman's worldwide client orders and intentionally created the Custom Software to be compatible with Weitzman's existing order fulfillment software. Thus, this second *Krause* factor also supports Weitzman's ownership of its copy of the software.

B.    The Parties Stored the Custom Software on Weitzman's Servers

It is undisputed that the Custom Software was stored on Weitzman's servers. However, MCR attempts to diminish the significance of this fact by referencing statements from John Fountas' deposition in this case. (MCR's Response at 14.) MCR highlights the fact that John Fountas stated that the parties stored the Custom Software on Weitzman's servers only out of "practical necessity" because the "source code" within the Custom Software was "self-executing" and had to be stored on Weitzman's servers to be operational. (J. Fountas Feb. 27 Depo. at 60-61.) However, MCR does not provide the full context of his statements. John Fountas also stated that while portions of Custom Software had to be stored on Weitzman's servers, the parties purposefully decided do so. (*Id.*) Furthermore, in his state court deposition, John Fountas expressly stated that the parties stored the Custom Software on Weitzman's servers per an "agreement." (J. Fountas State Court Depo. at 92.) Thus, it is undisputed that the parties chose to store at least portions of the Custom Software on Weitzman's servers, and therefore, this factor also weighs in favor of Weitzman's ownership of its copy of the Custom Software.

C.    Weitzman's Use of the Custom Software

As mentioned, the parties never executed any formal agreement reserving MCR's right to repossess Weitzman's copy of the Custom Software or to limit Weitzman's freedom to discard it. In fact, MCR acknowledged Weitzman's right to continue to use the Custom Software in Paul Fountas' letter to Phil Kodroff dated December 20, 2005, which stated that "[Weitzman] *has the right to use the software . . . .*" Thus, even after the initial dispute had arisen between the parties, MCR conceded that Weitzman maintained the right *to use* its copy of the Custom Software.[18]

---

[18] In the letter, MCR made a unilateral attempt to limit what Weitzman could do with its copy of the Custom Software by saying "but it cannot be modified, changed or reverse engineered by anyone." However, such statement is not relevant to the ownership question. Weitzman's ability to modify or add features to the Custom Software is discussed *infra*.

16

While the letter did not expressly state that this right was perpetual, such conclusion is the only reasonable inference because given the parties' dispute, MCR presumably would have attempted to retract Weitzman's continual use of the Custom Software if it believed it could do so. Additionally, Weitzman's perpetual right to use its copy of the software implies its right to destroy or discard such copy. *See Krause*, 402 F.3d at 123 (recognizing that the right to use a copy of software perpetually equates to having the right to throw it in the trash). Thus, the final two *Krause* factors also weigh in favor of Weitzman.

Moreover, to find that Weitzman does not own its copy of the Custom Software would be contrary to the parties' course of dealing. Weitzman engaged MCR for among other things to develop software for its business use. Specifically, Weitzman paid MCR by the hour to write computer code that would ultimately be used to facilitate its business needs. Thus, if Weitzman does not own its copy of the code that it paid to have written, it begs the question, what did it pay for? Therefore, because there is no disputed issue of fact upon which a reasonable jury could return a verdict for MCR, the Court finds, as a matter of law, Weitman owns its copy of the Custom Software.

      **b.    Weitzman Has The Right to Adapt, Alter And/Or Modify Its Copy Of the Custom Software For Its Business Needs Pursuant To § 117(a)(1)**

The second step in the § 117 analysis is to determine whether the modification of the programs was "an essential step in the utilization of the computer program[s] in conjunction with a machine." Relying on the *Aymes v. Bonelli* ("*Aymes*")[19] test, the *Krause* court stated that adaptations were essential where they were necessary to use the programs for the very purpose for which they were purchased. *See Krause*, 402 F.3d at 125-26. In *Krause*, there were four modifications at issue: (1) fixing "bugs," (2) changing the source code to add new clients, insert

---

[19] *Aymes v. Bonelli*, 47 F.3d 23 (2d Cir. 1995).

17

changed client addresses, and perform other routine tasks to keep the programs up-to-date, (3) incorporating the programs into the Windows based system Titleserv designed, and (4) adding capabilities such as the ability to print checks and to allow customers to access their records. The Krause court found that under the *Aymes* test the first two types of modifications were essential steps to the use of the computer programs because the programs could not function properly without taking these actions. Similarly, the court held that the third adaptation, modification of the software so that it could function with Titleserv's new system, was also "essential" under § 117(a)(1).

With regard to Titleserv's fourth modification, the addition of new features, the court undertook a lengthy analysis of what it means to be "an essential step in the utilization of the computer program." *Id.* at 125-29. The court looked to the CONTU Report and found that its writers envisioned a loose concept of necessity that would encompass the addition of features so that a program could better serve the needs of a customer for which it was created.[20] *Id*. at 128. However, the court also noted that right to add features could only be exercised so long as those new features did not harm the interests of the copyright proprietor. *Id.* The court held that Titleserv's changes to its copy of Krause's programs were "essential steps in the utilization of the computer programs in conjunction with a machine."

Here, Weitzman seeks a declaration that it has the right to modify and or add features to the Custom Software for its own internal business requirements. Having found that Weitzman

---

[20] The CONTU Report states:

Thus, a right to make those changes necessary to enable the use for which it was both sold and purchased should be provided. The conversion of a program from one higher-level language to another to facilitate use would fall within this right, <u>as would the right to add features to the program that were not present at the time of rightful acquisition.</u> *Id.* at 128 (emphasis added).

owns its copy of the Custom Software, § 117(a)(1) gives Weitzman the right to modify or add features to the copy of the Custom Software, consistent with the above-stated holding in *Krause,* so long as the modifications do not disrupt MCR's interests as the purported copyright proprietor in the Custom Software. There is nothing in the record before the Court that Weitzman's plans to use its copy will disrupt MCR's interests as copyright owner.[21] Thus, Weitzman is entitled to summary judgment on this issue.

### V. Conclusion

For the reasons set forth above, it is hereby

ORDERED that

(1)     Plaintiff's Summary Judgment Motion [DE 23] is GRANTED.

(2)     Plaintiff shall file a Proposed Judgment by **Friday, May 25, 2007** adhering to the Court's separately filed Order Requiring Proposed Judgment.

DONE and ORDERED in Miami, Florida this 23rd day of May, 2007

*[signature]*

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:
Counsel of Record

---

[21] Moreover, the parties expressly contemplated that the Custom Software would be expandable to be capable of adding functionalities, such as credit analysis of customers, mail merge, and others in order to grow with Weitzman's specific business needs. Thus, Weitzman's desire to modify the Custom Software in this regard comports with the parties' original intentions.